2-17-0191, people of the state of Illinois, President Kavanaugh and Peter J. Diaz. President Kavanaugh, Argumental on behalf of President Kavanaugh, excuse me, Mr. Stephen L. Richards. Argumental on behalf of President Kavanaugh, Ms. Anne O'Sullivan. Mr. Richards, hopefully you'll be able to get home. Yeah, I think I'll be fine. Thank you for your concern that I was able to manage. Thank you. Good morning, Your Honors. My name is Stephen Richards and I represent Peter Diaz, who is the appellant in this case. As Your Honor knows, he was convicted by a jury of reckless discharge, acquitted of one other charge, and sentenced to 24 months' conditional discharge. Let me just begin by stating the facts just from Peter Diaz's point of view. Obviously, it was contested and there was conflicting evidence. But from his point of view, he was at home in his house. He had tried to kick his son, Dallas Simpson, out a few days before. He knew a lot of bad things about Dallas Simpson, including many acts of violence, and that Dallas Simpson had threatened him the night before to shoot him. He heard a stop calling, is the way he put it. He heard a girl screaming that she wanted to go home, that she wanted to be let go. He couldn't find his phone. He told his girlfriend to call the police. He went upstairs with his gun, which was loaded. When he got up there, he saw Dallas Simpson. He held the gun behind his back. When Dallas Simpson approached him with a folding chair, he brought the gun out in front of him, held it at a 45-degree angle, that is, pointing towards the floor. And then his version of events is his gun went off when the chair was thrown at him. Now... And how did the gun go from 45 degrees to grazing Mr. Simpson? It didn't. It never grazed Mr. Simpson. Oh, all right. The bullet, in fact, the bullet, the trap of the bullet was down through the floor, went through the floorboards exactly as it would be on a 45-degree angle. So he never grazed... He didn't point it at him and shoot. Right. He didn't. What his, his, what he was saying is he was bringing it out from his, beyond, as an act of self-defense. He was pointing it at a 45-degree angle, in other words, to back Mr. Simpson off, who was approaching him in his own home after an argument, apparent fight between these two people, holding a folding chair. That was his version of events, obviously contested in some respects. But the question is, given that version of events, there's two issues in terms of ineffective citizens of counsel. One, as you know, the first struck me wrong, was it reasonable for counsel not to raise self-defense as a defense? How about defensive dwelling? That's not in your brief, but wouldn't that have even been a stronger defense? Your Honor... Because you don't have to have a violent or tumultuous entry. You can have a felony being attempted or being committed inside the dwelling place that can happen after the entry. Not only that, but the standard for what you can do in terms of, it's an offer of personal violence, which again is a lesser standard. In fact, I do bring this up in my reply brief as another possibility of defensive dwelling. And you're right, that's a stronger argument than one I should have possibly thought of before. But it's clear that either defense of others, self-defense, or defensive dwelling, none of those were raised. So what was left with was an argument that it was an accident and that Mr. Diaz had not acted recklessly. But based on the affidavit that was submitted by defense counsel, he submitted an affidavit, correct? Yes. That his client had informed him that it was an accident. Oh, no, no, that's not... That's a fair reference from... No, actually, let me clarify that, Your Honor. Defense counsel never submitted an affidavit. Defendant and his girlfriend submitted affidavits. They were never contradicted by defense counsel. I pointed out, and you can find this in the record at many points, that I didn't think that it was possible for the court to resolve this issue against me without having Mr. Payden, the attorney, come and testify or give an affidavit or something. He never did. So all that was in the record is Mr. Diaz's affidavit and his girlfriend's affidavit that they had brought up the issue of self-defense and Mr. Payden had told them, basically, if you say that you...unless you say you fired intentionally, I can't raise self-defense. It's impossible. I won't do it. You know, whatever. But to return to the...just to the issue of dealing both as to the first problem, the reasonableness of Attorney Payden's actions, I think the best argument for my position is actually found in the state's brief on pages 5 to 7. Because what they say, and they're talking about the Strickland problem, they say that basically it was a slam dunk on reckless discharge. Why? One, because Mr. Diaz said he did approach. He had the gun loaded. He did have his finger on the trigger. He did pull it out and point it. And there was testimony from an officer, Officer Damon, that that by itself is a definition of reckless because if you know how to handle firearms, you don't take out a gun and put your finger on the trigger without intending to use it. In other words, the chance of it going off in that position is so high that that would be a reckless act. But I agree with the state on that. The defense actually presented could not work given Officer Damon's testimony and given Peter Diaz's testimony. The only defense that could possibly work is defense of others, defense of self, or defense of dwelling. Because according to Officer Damon, who was underbutted, this was recklessness. The definition of recklessness was taking out the gun and having one's finger on the trigger and pointing it. But if you go then to self-defense, one of the things that has to be established is the defendant is not the aggressor. How do we establish this on this record? Well, that would ultimately be for a jury when a new trial is granted. But in terms of whether there was evidence that suggests that Mr. Simpson was the aggressor, not Dow Simpson was the aggressor, not Peter Diaz, there is at least some slight evidence of that, and I would say overwhelming evidence. We have a chair versus a gun. Well, it's a steel folding chair. Mr. Simpson has a violent history that Mr. Diaz knows about, including personal threats to himself. He's approaching at a short distance, and he appears to be about to throw the chair, which in fact is what he did. I mean, that's kind of – Simpson tried to sort of evade it by saying everything was blurry, but there's really very little context that the chair was in fact thrown. So the reasonableness of Mr. Diaz's actions would be an issue for the jury, but I would suggest that there's certainly enough evidence to justify the instruction, and the case was closely balanced at least on that issue because Dow Simpson was younger. He had a violent past. Mr. Diaz was in his own home, a home that he had ordered Mr. Simpson not to be in. So he finds somebody who shouldn't be there with somebody else he's never met fighting in his house. Here is a crash, which is logically Erica Miranda going to the floor. I think Mr. Simpson said that she threw herself to the floor. She said she didn't throw herself to the floor at all, so they were inconsistent. But I think the reasonable inference that a jury would draw is that Simpson was fighting with his girlfriend, and he threw her to the floor, and there was signs of a struggle. And then when Mr. Diaz intervened and said, let the girl go, I mean, again, he would be possibly intervening in a kidnapping on lawful restraint. Simpson didn't do it. He picked up the chair and approached. So under those circumstances, a reasonable jury could certainly have found in Mr. Diaz's favor had self-defense been raised, but it wasn't raised. So I don't think – I think the issue as to who is the aggressor in this situation is at least a question of fact for the jury, if not overwhelmingly in Mr. Diaz's favor. So I think it's clear that Attorney Payton's decisions were at least questionable enough that there should have been an evidentiary hearing. But since the opportunity to take an evidentiary hearing was not taken up by anybody or to get an affidavit from Mr. Payton, I think it would be logical just simply to remain in the case for a new trial in which Mr. Diaz could raise self-defense, defense of dwelling, or defense of others. There's kind of been shifting back and forth when we're in the trial court, both the judge and the state's attorney went on the first prong mainly. Now they've kind of switched in their brief, not talking about the first prong at all, but only about the second prong. But either – both prongs have been met. There's serious, serious question as to whether this was objectively reasonable given the strong evidence against Mr. Diaz without self-defense, given what Mr. Diaz could have introduced in terms of what the conversation was between everyone if there was self-defense, what he could have introduced about what he knew about Dallas Simpson and Simpson's violent past that threats towards him. So that would have been a better defense. And also there is a reasonable probability of a different outcome, which as Your Honor knows is not necessarily more likely than not to just sufficiently undermine confidence in the outcome we have. So... I guess the other question is when he heard the noise, when Mr. Diaz and his girlfriend heard the noise, did he know who was up there or did he have – was it reasonable for him to assume that it was Mr. Simpson? According to what he testified to a trial, he wasn't asked this directly, he didn't say that he knew Mr. Simpson was up there when he first came up. He heard her voice. He didn't recognize the voice. And apparently he had never met or didn't recognize Erica Miranda's voice. So he was going up here first with, you know, who knows in the house, burglars, you know, whatever, bringing the gun with him, telling his girlfriend to call the police. Then when he gets up there he does see Mr. Simpson there. But at that point he knows Mr. Simpson's violent past. It's his perception of the situation that Mr. Simpson has been fighting with his girlfriend, his girlfriend is calling for help. He reasonably at that point believes that some use of force is necessary to protect the girl and to get Mr. Simpson out or simply to protect the girl or to protect the status quo. And Mr. Simpson, even by his own testimony, really doesn't go along with that too well. Mr. Simpson also had a huge fit of forgetfulness during his testimony. He couldn't remember almost anything that happened during the incident. Also, I believe this is in the record, he was testifying under, I'm sure it's in the record, he was testifying under grant of immunity because of some certain things they found in the house. And I would agree that that wouldn't be relevant for a jury. But it was relevant to the jury that he had a pending case and was testifying under a grant of immunity. So his testimony is very suspect and was contradicted in some respects by that of his girlfriend, Erica Miranda. So given all that, this case more than deserves being remanded at least for an evidentiary hearing and I think more practically for a new trial at which Mr. Diaz can raise the proper defenses. I may not have used all my time, but I'm sure we open to more questions from the court. I think we're fine at this point. We have an opportunity to reply. Thank you. Good morning, Your Honors. Good morning, Counsel. May it please the Court, I wanted to address a few things that Counsel said briefly. In terms of Justice Burkett's question about defensive dwelling, that wasn't raised to the reply brief. I haven't briefed that issue and I do believe it's forfeited. It certainly can't be brought up at that time. And I think it also goes to show that it wasn't an obvious defense that could have been presented to a lot of attorneys, including appellate counsel. Well, I brought it up because all these events occurred in the defendant's own home. That's correct. And the defendant armed himself in his own home when he hears some screaming upstairs, correct? That's correct, yes. That's why it was an obvious question. Right. And I understand that, but I'm just saying it was not raised by, you know, on the appeal. Defensive dwelling is an offshoot of self-defense. So it is, based upon the facts, it is intertwined with the defendant's argument. Okay. Okay. I didn't address it directly because it wasn't the reply brief. In terms of whether or not we have an affidavit, and in this case we don't have an affidavit from the attorney himself, I wanted to point out that, in a sense, I think both sides, you know, that includes the state side and my brief, we got off a little bit in terms of, you know, this is brought up at the post-trial motion, the ineffective assistance, and we started to talk of it almost in terms of Kranko and an evidentiary hearing. And I would like to suggest that, upon further thought on that, I think that, really, this was the evidentiary hearing. They had affidavits, and, in fact, I found at page 955 of the record that the trial judge asked, would he be bringing in or subpoenaing trial counsel to testify? And his answer to that was, no, he would not be doing that. So that was his choice. I believe it was his burden to show that this was ineffective and this was actually a strategy, not a strategy, but actually a mistake of law by defense counsel, and he did not do that. Certainly there was some ambiguity that the trial court picked up on in terms of whether this was just so inconsistent and maybe not believable, you have two defenses going that, you know, it was the better pick to go with accident, or whether, in fact, there was an issue of trial counsel not knowing the law, and the court found in favor of the State, of course, on that issue. Certainly the physical evidence, now that I've been corrected, again, reading too many cases, you forget who got hurt and who didn't. If the bullet went through the floor, he wasn't aiming at the victim. That's correct. So accident might have been a more obvious defense. That's correct, and that's exactly one of the considerations probably made by trial counsel, which is that you have that fact, and if you say, well, I was aiming it with my finger on the trigger, pointed directly at him, well, then you really don't have a good, you know, you may really have recklessness right there if you don't have self-defense. On the other hand, if you say, so I wasn't pointing it at him, and that's the way I was taking care in a sense, well, then you don't really have self-defense if you're not pointing it at him with the intent to discharge it towards him in defense of yourself. And I think there's an inconsistency there as well as credibility problems. This defendant had prior statements to the officer, Officer Denman, and in those statements he didn't say that he did this as self-defense. He didn't say that he did it as an accident. So you're already asking the jurors to kind of find that the officer was wrong or that somehow there was an omission, you know, that a defendant wasn't thinking clearly or something of that sort. But you're already looking at an inconsistent statement with one defense, and now you're going to say, well, not only that, but he said something else that's inconsistent with yet another defense he's offering here. And I think it undermines his credibility overall as to what's occurring, and I think that's a consideration to, you know, to make a decision as to which is the stronger of these defenses and to go with it. But we argue that in terms of prejudice, and the reason for that is because, I mean, this is the entire theory of guilt or innocence here, and I think it comes out better to look at it in terms of prejudice. But that goes, if there's no showing of prejudice, which is our position, it certainly goes to the fact that then this was an unsound trial strategy by defendant, defense counsel. Now, he has, just to correct one thing that defense counsel said, defendant said that he had met Erica Miranda before, that he had met her. So that was something that counsel said that I think is incorrect, and the record will show that. He heard voices, but in terms of like a self-defense argument, there's a reason why you wouldn't bring it, and that's because it's really relatively weak in these circumstances. In fact, very weak, I would suggest. That is, first of all, he hears noises upstairs, and at trial, he says, I didn't know who it was. I brought my gun. I didn't know who it was. But to the officer at the time he was arrested, he said, I went upstairs to quiet down my son and his girlfriend. And I went upstairs to tell them to quiet down. Okay, so we have an inconsistency already in terms of is he really up there frightened? Is he really thinking already that somebody's in trouble, that he's rushing to her rescue? We have an inconsistency already, and that weakens his self-defense argument, had he made it. He goes up there and immediately determines, in fact, at this, you know, speaks up, and the girlfriend, and he sees them near the bathroom. But even under his testimony, at some point, she's in the bathroom. His son is no longer in the bathroom. If anything, if he's brought up on those terms, and certainly if he thought there was something going on of that nature, again, to weaken that self-defense, why wouldn't he have asked his girlfriend to wake up and make a call to the police? He did not. He rushes up with the gun, loaded, and eventually is pointing it at them. In fact, Erica and the defendant, excuse me, and Dallas, the victim, say that he pointed it directly at them when he got upstairs with the gun. But why wouldn't he have awoken his girlfriend if his phone, as he says, was not working? He didn't. He went running up there because, probably consistent with his statement to police, he wanted to quiet things down. He was mad. He was angry. He has a son upstairs living there who he doesn't want in the house anymore, and his son is still here, and now he's woken up in the middle of the night. Again, this goes towards why a self-defense would not really work in the defense of others, and he gets up there. She's now, anything to do with Erica Miranda has dissipated. He's now in a one-on-one, and this is where he discharges, and this is what we'd be looking at in terms of self-defense. He's now one-on-one with his son. His son has a chair. He doesn't have a gun. He has a chair. And to the extent that in his brief defense has argued, well, there could have been statements brought in about violent tendencies, about prior threats, even with all of that, those threats are, you know, baby, go get my gun. So he doesn't have his gun there, even under the best of circumstances for the defense. Is it imminent? No, it's not that he would have a gun on him. So we're looking at who is the aggressor. He was. He came running up the stairs with a gun, not knowing what was going on, without making a call to police. His girlfriend, Christine, said that she only woke up later when he called down to her to call the police, but that was when the struggle was going on between him and his son. So, you know, all these facts would show just a weak self-defense argument would have been, and that, therefore, there's really no prejudice from the defense counsel's failure to offer that as an alternative theory. In terms of one more thing I wanted to address, counsel has said that he agrees with our argument that just coming up with the gun and with the finger on the gun, below the gun, and pointing it, excuse me, that would be recklessness per se. So that makes that a weak argument that he should have never made. But that's not our argument. Our argument is that that is best practice. Officer Damman said, safety-wise, best practice, what you should be doing is never putting your finger on a trigger and pointing it at somebody when it's loaded. But nobody said that that was reckless, a conscious disregard of a substantial and unjustifiable risk that circumstances exist and that a result will follow, and a gross deviation from what a reasonable person would exercise. Nobody said that that's per se. And, in fact, I think that's a lot of what defense counsel tried to get in below, that, you know, evidence that he was, Dallas was drinking, that he may have been taking prescription drugs or some other type of drugs, that he was a wild man. And so, therefore, under these circumstances, the fact that he was doing this, as long as he was not pointing the gun directly at them, was not reckless. And that was his argument in regards to that. Is there any evidence that the victim himself had a gun or had access to a gun? No, there's really none. And one of the affidavits, I believe it's Dallas Simpson's, I'm sorry, it's not. It's Defendant's girlfriend. She says that the night before there were threats that Defendant would get a gun and kill his father, again, suggesting that he might not have it. In fact, the evidence at trial is that afterwards they were arrested and then were arrested, taken away. A search warrant was obtained and no one was found. And that's also pretty good evidence that these threats were probably made because here comes this aggressor, meaning the defendant, pointing a gun at him, and he's trying to scare off his father by saying things that aren't even true but trying to scare him into putting down the gun and saying, okay, let's call a halt to this. So unless there are other questions. So your bottom line is this was clear trial strategy, no prejudice to the defendant? Absolutely. Yes, Your Honor. Let me ask you this, though. The post-trial motion was somewhat of a hybrid of a post-trial motion and the vestige, I guess, of a crankle hearing. Do you think that there was a sufficient inquiry by the trial judge to determine whether or not enough was raised to pursue? I do, Your Honor. I mean, you know, looking at this, it's not really, obviously, a crankle hearing of any sort because we have no conflict here. You know, we have a new counsel, and new counsel could have brought in whatever he wanted to and was invited to do so. I think that, first of all, that's his burden then to bring in, if he thinks it's necessary, to bring in and subpoena and have him testify as to what he was thinking. He being the prior attorney. He being, I'm sorry, the lawyer. The first lawyer. Yes, the trial attorney. In case, you know, he would say, you know, I really. So you see the fork in the road is because the defendant here was not standing before the court alone complaining of these issues, but because he had counsel, that changes the game. Yes, that, yes, exactly. And the affidavits, which, you know, were not only just his, but from his girlfriend, too, but with an attorney, a new attorney who's conflict-free, who is determining what's the best way to proceed and being told or telling the judge, I don't care to subpoena the attorney. We're going to go on the affidavits. And given the strong presumption of effectiveness, counsel just didn't meet that burden, new defense counsel, of showing that this was not trial strategy. Exactly. That's exactly right. It was their burden, and they did not meet it. For that reason, we would ask this court to affirm the defendant's conviction. Thank you. Mr. Richards, do you have anything you wish to add in reply? I do. First of all, in terms of the actual facts of what he has testified to, certain things have been left out. So let me just make it clear exactly what the situation was. First of all, he didn't hear just an argument. What he heard was a girl crying. He hadn't met her before, but he didn't recognize her voice. Stop, let me go. Please, please, please let me go. I want to go home. Please, please, please, please stop. Stop. And then he heard step falling and sounds of a struggle. He could not find his phone, but he did yell up in a bluff, whoever is going on upstairs had better stop. The police are on their way. I called the police. And then later, when his girlfriend, he called out to his girlfriend to call the police. And in fact, she did call the police, but that's how the police got there. And he then, when he went to the second floor, according to him, it appeared that there were two people were fighting in the bathroom. He said, stop, let the girl go. Everybody needs to come out. Again, he's taking reasonable measures to control the situation, figure out what's going on. He had the gun behind his back. Simpson started walking to him. He says, stop, just let the girl go. He still has the gun behind his back. And he doesn't take the gun out in front, which is the act of force, putting the gun out in front until the steel chair is picked up and it appears it's going to be thrown at him. As I think the evidence is, it was, because even Mr. Simpson really didn't deny that. He just said it was all blurry. And he couldn't remember whether he had thrown the steel chair or not. So contrary to what the state said, this was a good case of self-defense or defense of duality or defense of others. What about the statements that the defendant makes to the police? I think that's where they arrive. Okay. Those are, I do have some things to say about those, and those are, it's extremely important in a couple of senses. First of all, these are all oral statements. There's no written statement, no acknowledgment by Mr. Would your position be your client didn't make those statements? He testified he didn't make those statements. And there should have been a tiebreaker because the car was equipped with recording equipment, but according to the state, and this is in the record, they didn't download their recording fast enough. And the car was in an accident, and therefore the recording was destroyed, and therefore it wasn't available to either side. And that's on the state, obviously. It's not our burden. Moreover, the officer's testimony was not too credible because in an attempt to make things a lot better, he said on the stand that Mr. Diaz said I pointed the gun at Dallas Simpson. He was impeached with his police report, which said I pointed the gun at the floor. Moreover, a statement to the police officer, I fired the gun, is consistent with somebody's shorthand for the gun fired when somebody threw something at me. And I think it's not inconsistent. It wasn't a very detailed, long statement, even according to the officer. It was a short conversation. As I said, it should have been reported. We should know exactly what was said, but we don't. So for all those reasons, and further, the statement I did fire the gun is more suggestive of self-defense than of accident. So the theory that accident was better and that was— Right. That would have supported self-defense. If the jury believed that's what he really said or that's what really happened, that he actually intentionally pulled the trigger rather than having the gun go off when the chair was thrown at him, that would have strengthened self-defense and not weakened it. You don't dispute the argument of the State that it is your burden to show that this was not trial strategy. Can you discuss a little bit the failure to get an affidavit from defense counsel? Well, I don't believe—I presented both the affidavits of Peter Diaz and Christina Pruitt, and they were uncontradicted. Obviously, the only thing that defense counsel could have said is either I didn't say those things, but there's no evidence that he didn't say those things, or I meant something else, but there's no evidence that he meant something else. And the words he used—assuming we're taking this as an evidentiary hearing effect, the evidence we have at the evidentiary hearing is Christina Pruitt's affidavit. We have Peter Diaz's affidavit. Nobody ever suggests that they should need to testify in addition. Go forward and finish your thought. Testify in addition. And the statements that the attorney makes are very categorical. You have to say that you pulled the trigger in order to raise self-defense. Wait a minute. It's not what the attorney said, but it's what your client said the attorney said. Correct. And what my client said the attorney said, I would suggest, is evidence because it reflects the attorney's state of mind. But judges don't rule on effectiveness of counsel in a vacuum. I mean, the trial judge saw and watched this attorney perform during the trial, correct? He did, and if you read the record, the trial judge—first of all, the relationship between the attorney and the trial judge was not pleasant, I mean, to say the least, if you read. I didn't go into all this, but it was not pleasant for a number of reasons, and the attorney did some things which the judge thought were unethical and he called him on, including letting the jury know that a felony was involved. So I'm not—the judge never said, boy, this was the greatest attorney I ever saw and he was wonderful and so forth. What the judge did was made his own inference that the attorney might have been talking about trial strategy, but there's nothing in the record to support that because it's—the attorney never phrases it in terms of, we can't do it because of an inconsistent statement, we can't do it because the jury would be confused. No, he says, you can't do it. Unless you say you intentionally pulled the trigger, you can't raise self-defense. Defendant believed that, but the case law contradicts it. Contradicts it directly. The preceding act, of course, holding the gun, and then an accident following is on par with Bedoya and with Everett and with Montoya, the remaining case. It's a hybrid defense in some sense because you're dividing the acts, but it's the only reasonable defense in this circumstance. Is there any real evidence in this record that the chair actually caused the discharge because it might have hit defendant's arm? Well, the chair was there. They found the chair there. They found it on the floor, and I think that that's what Mr. Diaz said, and he wasn't contradicted by anybody else. Mr. Simpson said it's all a blur. I don't know what happened. Ms. Miranda was in the bathroom. So not only is there evidence that it happened, there's no evidence to contradict that version of events. For those reasons, there should be a reversal and a new trial should be granted. Thank you. Thank you both for your argument today. We will issue a decision shortly, and we will now take a recess to prepare for our next argument.